IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MALISSA ANN SMITH,                          )
                                            )
        Plaintiff,                          )
                                            )
        vs.                                 )   Civil Action No. 10-1178
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
        Defendant.                          )

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Malissa Ann Smith and Defendant Michael J. Astrue, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as she seeks remand for further consideration.

**II.   BACKGROUND**

        A.    Factual Background

        Plaintiff Malissa Ann Smith was born on June 9, 1961. (Certified Copy of Transcript of Proceedings before the Social

Security Administration, Docket No. 6, "Tr.," at 113.) After high

school, she began, but did not complete, a community college medical

secretarial program. (Tr. 224.) In January 2004, Ms. Smith was

hospitalized for suicidal ideation and depression after she took an

overdose of prescription medication. (Tr. 196.) At the time, there

was a questionable diagnosis of bipolar disorder.[1] (Tr. 339, 197.)

After her release from the hospital in January 2004, Ms. Smith

began treating with Dr. Fidel Velez, a general practitioner, for both

her physical and mental health problems. In August 2004, after

treating her for back and neck pain for several months, Dr. Velez

diagnosed Ms. Smith with fibromyalgia[2] in addition to the diagnosis

---

[1] Bipolar disorder is a mental condition resulting from disturbances in the areas of the brain that regulate mood. It is characterized by periods of excitability (mania) alternating with periods of depression. During manic periods, a person with bipolar disorder may be overly impulsive and energetic, with an exaggerated sense of self. The depressed phase brings overwhelming feelings of anxiety, low self-worth, and suicidal thoughts. The mood swings between mania and depression can be very abrupt, or manic and depressive symptoms may occur simultaneously or in quick succession in what is called a mixed state. There is a high risk of suicide with bipolar disorder and it is often accompanied with alcohol or other substance abuse. *See* the medical encyclopedia entry for "bipolar disorder" at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited April 29, 2011) ("MedlinePlus.")

[2] Fibromyalgia is a common condition characterized by long-term, body-wide pain and tender points in joints, muscles, tendons, and other soft tissues. It has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety. The overwhelming characteristic of fibromyalgia is long-standing pain associated with 18 defined "tender points," which are distinct from "trigger points" seen in other pain syndromes. The soft-tissue pain of fibromyalgia is described as deep-aching, radiating, gnawing, shooting or burning, and ranges from mild to severe. Specific symptoms include

2

of bipolar disorder which he had now confirmed. (Tr. 295, 285.)

Between 1996 and 2001, Ms. Smith worked as a cook in a fast food restaurant, then as a nurse's aide from 2001 through 2002, returning to that job for short periods again in 2004 and 2005. (Tr. 145.) Ms. Smith stopped working as of July 31, 2005, when, as she later noted, "the depression became too much for me and I couldn't continue." (Tr. 144.)

## B. Procedural Background

On June 18, 2007, Ms. Smith filed applications for disability insurance benefits and supplemental security income, alleging disability as of July 31, 2005, due to depression, bipolar disorder, fibromyalgia and back problems.[3] (Tr. 111-120; 121-123; 144.) The Social Security Administration denied her applications

tender points on the back of the neck, shoulders, chest, ribcage, lower back, buttocks, thighs, knees, and elbows; fatigue; sleep disturbances; body aches; reduced exercise tolerance; and chronic facial muscle pain or aching. Diagnosis of fibromyalgia requires a history of at least three months of widespread pain, as well as pain and tenderness in at least 11 of the 18 tender-point sites. Laboratory and x-ray tests may be done to confirm the diagnosis, primarily by ruling other conditions with similar symptoms. In mild cases, symptoms may go away when stress is decreased or lifestyle changes are implemented. Treatment may include medications to decrease depression, relax muscles, improve sleep quality and reduce inflammation; physical therapy; psychological and life-style counseling; diet modification; stretching exercises and massage; and, in severe cases, pain management programs. See medical encyclopedia entry at MedlinePlus.

[3] According to the ALJ's decision, these were the third applications for SSI and DIB filed by Ms. Smith. (Tr. 11.) The applications filed in October 2002 and December 2005 were initially denied; Plaintiff requested and received a hearing before an administrative law judge; and the Appeals Council denied her request to review the decisions denying benefits in each case. There is no evidence Ms. Smith filed further appeals for review by a federal district court.

3

on October 12, 2007, reasoning that although due to her pain and mental impairment, she could not return to her previous work as a cook, there were other jobs she could perform. (Tr. 53-57, 58-62.)

Plaintiff then timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on March 18, 2009, before Judge Theodore Burock, in Charleston, West Virginia. Ms. Smith, who was represented by counsel, testified, as did an impartial vocational expert ("VE"), Cecilia Thomas. Judge Burock issued his decision on August 19, 2009, again denying benefits. (Tr. 8-23.) On July 15, 2010, the Social Security Appeals Council advised Ms. Smith it had chosen not to review the ALJ's decision, finding no reason under its rules to do so. (Tr. 1-3.) Therefore, the August 19, 2009 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). On September 7, 2010, Plaintiff filed suit in this Court seeking judicial review of the ALJ's decision.

C.  Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff

4

resides.

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in

turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000).

## IV. **ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe she is unable to pursue substantial gainful employment[4] currently existing in the national economy.[5] The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(I); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). To be granted a period

---

[4] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5] A claimant seeking supplemental security income benefits must also show that her income and financial resources are below a certain level. 42 U.S.C. § 1382(a).

of disability and receive disability insurance benefits, a claimant

must also show that she contributed to the insurance program, is under

retirement age, and became disabled prior to the date on which she

was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The

Commissioner does not dispute that Ms. Smith satisfied the first two

non-medical requirements and the parties do not object to the ALJ's

finding that Plaintiff's date last insured was December 31, 2006. (Tr.

23.)

To determine a claimant's rights to either SSI or DIB,[6] the ALJ

conducts a formal five-step evaluation:

- (1) if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

- (2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits her ability to do basic work activity, she is not disabled;

- (3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

- (4) if the claimant retains sufficient residual functional capacity ("RFC")[7] to perform her past relevant work, she is

---

[6] The same test is used to determine disability for purposes of receiving either DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

[7] Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9p defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week,

7

> not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support her position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[8] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Burock first concluded Ms. Smith had not engaged in substantial gainful activity since July 31, 2005. (Tr. 14.) In resolving step two, the ALJ found that as of the date of the hearing, Plaintiff suffered from a number of severe impairments: bipolar disorder, degenerative disc disease of the cervical spine, back impairment, headaches, fibromyalgia, and sarcoidosis.[9] (Tr. 14.)

---

or an equivalent work schedule."

[8] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

[9] Sarcoidosis is an inflammatory disease that starts with small grain-like lumps, usually in the lungs or lymph nodes. It most often affects the skin, eyes or liver. See medical encyclopedia entry at MedlinePlus.

At step three, the ALJ concluded none of Plaintiff's impairments, considered singly or in combination, satisfied the criteria of any relevant Listing. That is, when considering Plaintiff's degenerative disc disease of the cervical spine and back impairments against Listing 1.04 (disorders of the spine), the ALJ found no evidence of nerve root compression, limitation of spinal motion, motor loss accompanied by sensory or reflex loss, or positive straight leg raising as required to meet or equal that Listing. Similarly, when evaluating Ms. Smith's headaches against various neurological impairments (Listing 11.01), the ALJ determined that she did not meet the criteria. The ALJ evaluated Plaintiff's fibromyalgia under Listings 1.02(A) and (B) (major dysfunction of a weight-bearing joint or a peripheral joint in the upper extremities), and 14.09 (inflammatory arthritis), but there was no evidence of inability to ambulate effectively or perform fine and gross movements effectively to the extent required to meet or equal those Listings. The ALJ evaluated Plaintiff's sarcoidosis against Listings 3.01 (respiratory impairments) and 14.01 (immune system impairments), again concluding her condition did not satisfy either of those Listings. Finally, when evaluating Plaintiff's bipolar disorder against Listing 12.04 (affective disorders), the ALJ concluded Ms. Smith had no more than mild to moderate restrictions as a result of her impairments. (Tr. 14-15.)

At step four, the ALJ concluded Plaintiff retained the residual functional capacity "to perform light work. . .except she is limited to routine repetitive tasks involving only one or two steps and requiring little independent decision making." (Tr. 16.)

The ALJ further concluded that Plaintiff could return to her past relevant work as a cook which the Vocational Expert described as semi-skilled, light work in the environment in which Ms. Smith had previously performed the job, i.e., in a fast-food rather than full-scale restaurant. (Tr. 21, 39.) Based on Plaintiff's age, high school education, work experience, and residual functional capacity, the ALJ concluded that in addition to work as a fast-food cook, other jobs existed in significant numbers in the economy which Plaintiff could perform despite her limitations, for example, security guard for an office or building, cashier, and inspector. (Tr. 22.) Thus, she had not been under a disability between July 31, 2005, and the date of the ALJ's decision and, consequently, was not entitled to benefits. (Tr. 22-23.)

B. Plaintiff's Arguments

Ms. Smith raises three interrelated arguments in her brief in support of the motion for summary judgment. (Doc. No. 14.) First, contrary to the ALJ's decision, the medical evidence, including the reports of one-time consulting examiners "handpicked by the Commissioner," uniformly indicates that Ms. Smith had mental

and physical impairments sufficiently severe to preclude any form of substantial gainful employment. Second, the ALJ committed three legal errors: he relied on his lay opinion in lieu of medical evidence; his analysis of Ms. Smith's credibility was flawed because it was based on misrepresentations of the evidence; and he gave excessive weight to Ms. Smith's minimal activities of daily living in finding she was not disabled. Finally, the ALJ failed to provide the detailed "function by function assessment" of Ms. Smith's RFC and failed to include all her documented functional limitations into the hypothetical questions posed to the Vocational Expert.

We agree with Plaintiff's arguments that the ALJ erred by relying on his own lay opinion and his credibility analysis was flawed. But, more importantly, the Court cannot perform the necessary meaningful analysis of his decision because we cannot identify the medical evidence on which the ALJ relied in reaching his conclusions about Ms. Smith's physical limitations. We therefore remand for reconsideration.

C. Analysis

1. *Proper consideration of medical opinions:* Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had

an "ongoing treatment relationship" with her are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with her, e.g., a one-time consultative examiner. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. §§ 404.1502 and 416.902.

The regulations carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. §§ 404.1527 and 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) Id.; see also Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the

claimant as a consultant" and the least weight given to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c) and 404.1527(d)(2).

Although an ALJ may accept some parts of the medical evidence and reject others, he must consider all the evidence and give cogent reasons for discounting any evidence, particularly when he rejects evidence that suggests a contrary disposition. Adorno, 40 F.3d at 48. In particular, "when rejecting a treating physician's findings or according such findings less weight, the ALJ must be as 'comprehensive and analytical as feasible,' and provide the factual foundation for his decision and the specific findings that were rejected." Fennell v. Astrue, CA No. 09-714, 2010 U.S. Dist. LEXIS 136029, *50 (W.D. Pa. Dec. 23, 2010), quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). In "the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett v. Commissioner of Social Security, 220 F.3d 112, 121 (3d Cir. 2000) (internal quotation omitted.)

2. *Review of the medical evidence:* In each of the following sections, we summarize according to source the medical treatment Plaintiff received for her physical impairments during the period 2004 through 2008. We then note the ALJ's summary and conclusions drawn from each physician's records.

**a. Dr. Fidel Velez:** Plaintiff's primary care physician was Dr. Fidel Velez at the North Apollo Health Center. (Tr. 267-322; 352-357.) His records cover the period February 2004, shortly after she was released from Allegheny Valley Hospital following her suicide attempt in January of that year, through November 2008. In February 2004, Ms. Smith complained to Dr. Velez of bilateral leg pain (Tr. 297); on March 1, she also reported joint swelling, pain in her right leg, and generalized body aches (Tr. 295-296.) In a follow up appointment on March 18, Dr. Velez noted that although she was doing well with her bipolar condition, her sciatica had worsened, and she was experiencing back pain and numbness, along with pain and tingling in her legs. (Tr. 293-294.) At her next appointment on April 1, 2004, Dr. Velez commented that the sciatica had not improved and she was still experiencing the same back and leg pain. She showed tenderness in her left lower paraspinal muscles, left lower extremity sciatic notch and the right lower trochanteric bursa. Ms. Smith was referred to a chiropractor,

but no such records appear in the transcript. (Tr. 292.)[10]

Plaintiff continued to treat with Dr. Velez approximately every month to six weeks through the remainder of 2004, still complaining of back pain, increasing tenderness in her back muscles, and numbness in her right arm and hand.[11] (Tr. 290.) On June 23, Dr. Velez noted that her pain – described as being "all over" her body -- was worse when she worked. His physical examination revealed leg pain bilaterally, muscle pain and weakness but no muscle swelling, and back pain. She further complained of joint pain, tenderness and stiffness, but there was no restriction of motion, swelling or weakness in her joints. She had tenderness throughout her back and all extremities which Dr. Velez referred to as unspecified myalgia

---

[10] At several points in this Memorandum, the Court notes the fact that a physician recommended that Ms. Smith consult with a specialist. It cannot be determined from the record if Ms. Smith ignored these referrals or if their reports or treatment notes are simply missing from the transcript. On remand, Plaintiff and the ALJ should investigate which circumstances apply and proceed accordingly. *See* Money v. Barnhart, No. 03-2553, 2004 U.S. App. LEXIS 3654, *13 (3d Cir. Feb. 25, 2004) (although the claimant has the burden to develop the record regarding her disability, the ALJ is charged with the duty of ensuring that the claimant's complete medical history ( i.e., the records from the claimant's medical sources for at least 12 months preceding the date on which she filed for disability) is on the record before finding she is not disabled.)

[11] We recognize and have kept in mind throughout our discussion of the medical evidence that "the mere memorialization of a claimant's subjective statements in a medical report does not elevate those statements to a medical opinion." Morris v. Barnhart, No. 03-1332, 2003 U.S. App. LEXIS 22054, *12 (3d Cir. Oct. 28, 2003). An ALJ may discredit a medical opinion "that was premised largely on the claimant's own accounts of her symptoms and limitations *when the claimant's complaints are properly discounted.*" Id. (emphasis added.)

and myositis.[12] He recommended that she see a rheumatologist, but there are no such records in the file. (Tr. 288-289.) He also recommended that she stop working and on June 24, 2004, wrote to her employer stating that "due to her medical condition Malissa Smith is unable to continue to work." (Tr. 322.) At her next appointment on July 21, 2004, when she complained of the same tenderness in muscles throughout her body, loss of energy, lower backache and back pain radiating into her legs, Dr. Velez continued with his diagnoses of unspecified myalgia and myositis, noting in particular tenderness in the bilateral upper, middle and lower paraspinal muscles, and at a number of specific points throughout her body. (Tr. 286-287.) He ordered a number of laboratory tests and x-rays; the x-rays of her lumbosacral spine were essentially normal without disc narrowing although there was facet joint narrowing with mild sclerosis at L5-S1 and L4-5. (Tr. 306.) In a follow-up appointment on August 4, 2004, when she demonstrated no muscle or joint pain, weakness, swelling or inflammation, restriction of motion, atrophy or backache, he changed his diagnosis to fibromyalgia. (Tr. 285.)

Dr. Velez continued to treat Ms. Smith for fibromyalgia throughout 2005 and prescribed a number of different medications for pain. (Tr. 279-281.) Sometime between December 2004 and February 2005, Plaintiff attempted to return to work but her fibromyalgia was

[12] Myositis is a general term for inflammation of the skeletal muscles. *See* medical encyclopedia at MedlinePlus.

reactivated and she was unable to continue. (Tr. 283-284.) A
series of x-rays of the cervical spine taken on March 5, 2005, showed
prominent degenerative changes at the C4-5 and C5-6 disc levels with
disc space narrowing and osteophyte formation. There was also
reversal of the normal cervical curvature at this level. (Tr. 304.)
In May 2005, Dr. Velez noted that Ms. Smith demonstrated tenderness
in 14 of 20 areas associated with fibromyalgia and in August she
continued to have bilateral arm pain with numbness in her arms and
hands (Tr. 279-280.)

In July 2006, after several more months of treatment by Dr.
Velez, Ms. Smith was sent to the Pain Clinic at Armstrong County
Memorial Hospital ("ACMH.") (Tr. 272; see discussion below.) In
September, she had an MRI of the cervical spine which revealed a mild
degree of spinal stenosis at the C4-5 level and moderate degree of
spinal stenosis at the C5-6 level secondary from central bulging
disc, with bilateral bony encroachment on the neural formina by
osteophytes at those levels. There was no large disc protrusion,
fracture or destructive lesion noted. (Tr. 301.) By December of
that year, Ms. Smith began experiencing increased fibromyalgia
symptoms and bilateral headaches which she described as achy,
pressure-like and of mild to moderate severity. (Tr. 270-271.)

The headaches continued into January 2007, when Ms. Smith
complained of deep, dull pain bilaterally lasting for several hours

17

two or three times a week.[13] In July, a series of x-rays of the lumbosacral spine revealed that the disc and vertebral body heights were well maintained, the pedicles were intact, and the margins of the muscles in the lumbar region were symmetrical. Neither spondylolisthesis nor spondylolysis[14] was noted. (Tr. 300, 311.)

In February 2008, Ms. Smith asked Dr. Velez for a referral to a different pain clinic because she was unable to continue at ACMH due to transportation problems. He recommended the "WRH" pain clinic but there are no records from that facility. He continued to treat her for back pain, fibromyalgia, and obesity. (Tr. 267.) In the last records from November 2008, Ms. Smith consulted with Dr. Velez for back pain, migraine headaches and light sensitivity. He examined a lump on her left arm which he concluded could be a recurring sarcoidosis which she had contracted as a child. (Tr. 267.)

In his summary of Dr. Velez's medical evidence, the ALJ noted that Plaintiff had been diagnosed with degenerative disc disease of the cervical spine, back impairment, headaches, fibromyalgia and

---

[13] At this time, Dr. Velez recommended that Ms. Smith consult with a Dr. Raglianai for her headaches and sensitivity to light, but no records from that treatment appear in the record. (Tr. 269.) Similarly, she was referred to an unidentified rheumatologist in June 2007, but there are no associated records. (Tr. 268.)

[14] Spondylolisthesis is a condition in which a vertebra in the lower part of the spine slips out of position onto the bone below it. It usually appears between the fourth and fifth lumbar vertebrae and is most commonly caused by degenerative disease. Spondylolysis refers to a fracture in a vertebra, usually where the lumbar spine joins the sacrum. See medical encyclopedia entries at MedlinePlus.

18

sarcoidosis, each of which he considered a severe impairment. (Tr.
14.) He noted that she had been diagnosed with fibromyalgia on
August 31, 2005; actually, the first mention of fibromyalgia in Dr.
Velez's notes appears in August 2004. (Tr. 285.) Similarly, he
commented that she complained of low back pain on June 21, 2007, when
the records show she had been treated for lower back pain as early
as March 18, 2004. The first mention of migraine headaches was not,
as the ALJ noted on November 11, 2008, but rather December 2006, when
the doctor noted that her symptoms had begun "months ago." (Tr.
270.) The ALJ compared Plaintiff's medical history of degenerative
disc disease, headaches, fibromyalgia, and sarcoidosis to the
appropriate Listings (Tr. 14-15), and Plaintiff does not argue that
any of her physical conditions satisfied or equaled a Listing or that
the ALJ failed to apply the correct Listings.

Although for the most part, the ALJ summarized Dr. Velez's
records accurately, there is a curious paragraph in his decision,
that is:

The objective findings do not support the extreme
limitations alleged by the claimant and reveal that she
is not credible. Fidel Velez, M.D. noted on August 31,
2005, that the claimant had [an] assessment of
fibromyalgia. However, Dr. Velez indicated the
claimant's mood and affect were appropriate.
Furthermore, during an emergency room visit on March 8,
2006, the claimant reported having back pain, but noted
it was "only off and on." The claimant's musculoskeletal
examination was noted to be unremarkable and she was
instructed to follow-up with Dr. Velez. (Exhibit C-2F.)
In fact, during examination on March 17, 2006, Dr. Velez

19

indicated the claimant had normal activity and energy level (Exhibit C-10F). These objective findings do not support the severity of pain alleged by the claimant. The claimant testified that her pain was constant, but these records reveal she reported it was "only off and on."

(Tr. 17.)

The ALJ's report of Dr. Velez's findings on August 31, 2005 – that is, her diagnosis of fibromyalgia and the note that her mood and affect were appropriate – is correct. (Tr. 279.) Ms. Smith was consulting with him on that day, however, for arm pain bilaterally with numbness in her arms and hands. Dr. Velez further noted that her judgment was appropriate, she was oriented and demonstrated normal memory. The Court is unable to determine from Dr. Velez's notes why a normal mood and affect would cast doubt on his assessment of fibromyalgia or the credibility of her statements as to pain and limitations. As for the second example, it is accurate that on March 8, 2006, Plaintiff went to the emergency room at Allegheny Valley Hospital and that the examination of her musculoskeletal system was "unremarkable." (Tr. 201-202.) She was treated for "cough, congestion, sputum production with pain on inspiration with mild shortness of breath." The notes also indicate complaints of "tingling in her both [sic] legs and arms and pain in the chest [that] was worse on inspiration." She complains of back pain, but it is only off and on, and it is much worse in the last few days." The diagnoses were bronchitis with possible pleurisy and "chronic back

pain in exacerbation." (Id.) The purpose of her visit to Dr. Velez on March 17, 2006, was to follow up on her bronchitis and pleurisy, at which time he noted that she was "100% better now." He did note normal activity and energy level (without indicating what "normal" implied for Ms. Smith), but did not make any comment at all on her musculoskeletal system or on the presence or extent of pain. (Tr. 274.) Moreover, the emergency room note was made approximately three years prior to the March 2009 hearing at which Ms. Smith testified that her pain was "constant." Her testimony is consistent with the fact that during those three years she continued to treat for back and neck pain both with Dr. Velez and for a time at the ACMH Pain Clinic. In short, the ALJ appears to have based his credibility determination at least in part on inconsistencies between events and reports which have little to do with each other rather than on medical evidence contradicting Dr. Velez's findings and treatment notes.

**b.** **The Armstrong County Memorial Hospital Pain Clinic and related consultations:** As noted above, Dr. Velez recommended in July 2006 that Ms. Smith be examined at the ACMH Pain Clinic. However, no records from the Clinic appear in the transcript until February 28, 2007. (Tr. 257-258.) [15] At the earlier

---

[15] Again, this may be an example of missing records since Dr. Barrett refers in the first notes from February 2007 that Ms. Smith "presents for *reevaluation* regarding neck and upper extremity pain." (Tr. 257.) He also refers to a urine drug screen test completed in September 2006, which would appear to be consistent with the timing of Dr. Velez's recommendation

21

appointment, Ms. Smith had been asked to get an MRI which Dr. Randall Barrett reported had shown "some cervical degenerative disc disease, resulting in mild to moderate canal stenosis with osteophytic encroachment on the neural foramen." (Tr. 257; *see also* Tr. 301.) Ms. Smith described her pain at the level of 5 to 7 on a 10-point scale and stated that it was "constantly present," with "occasional sharp shooting pains that result in nearly jerking or uncontrolled jumping of her arm." (Tr. 257.) She also complained of low back pain but Dr. Barrett was unsure if this was referred pain from her neck. Walking, sitting and climbing stairs aggravated her complaints while hot baths, moist heat, and motrin provided some relief. She was independent in her activities of daily living although her sleep was poor due to pain and her physical activity was limited. On examination, Ms. Smith showed a good range of motion in the cervical spine; pulses in her upper extremities were +2. There was diffuse tenderness in the cervical and paracervical myofascial region, with "significant spasm" in the rhomoids and trapezius bilaterally, more so on the left.[16] There was no atrophy

___

and information about prior drug use which was not revealed during her "initial consultation."

[16] A principal symptom of fibromyalgia is the presence of tender spots at 18 precisely fixed locations on the body which cause muscle spasms when pressed. This and other "symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).

in her arm muscles, but some mild weakness with triceps extension and biceps flexion, more on the left than on the right. Dr. Barrett's impression was cervical degenerative disc disease, cervical spinal stenosis, upper extremity parasthesia (numbness and tingling), and depression. He recommended a series of two or three cervical epidural steroid injections after which he would assess her progress.

In his notes from this consultation, Dr. Barrett made the following comment which is set out in its entirety because of the ALJ's subsequent reliance on it:

It is of note that although the patient did not disclose this during her initial consultation, nor does she disclose it today, there have been some issues regarding illicit substance use as recently as September 2006 in which we have results of a urine drug screen completed one day after her visit here. She did identify both cannabinoids and cocaine. She has had a long-standing history of disuse [?] for many years documented from records received from Allegheny Valley Hospital.

(Tr. 257.)

Dr. Barrett further commented after his proposed recommendations, "[A]t this point. . .we will not be prescribing narcotic management from our office given this patient's history and her nondisclosure of her illicit substance use in our initial consultation, although the patient has not requested narcotic management from our office." (Tr. 258.)

Ms. Smith returned to Dr. Barrett on July 17, 2007. (Tr. 255-256.) He noted her diagnoses at that time were cervical

23

spondylolysis and mild early neural foraminal stenosis for which she had previously undergone "therapy base models," but had received no chiropractic management. She had been prescribed anti-inflammatory medications, but Dr. Barrett commented there was "no indication for analgesic management." He again noted her history of drug abuse and her report that she had been sober for two years. Instead of any type of opioid management, the proposed primary treatment plan was injections and repeated physical therapy. If this did not provide "significant improvement" and she continued in "significant distress, pain and functional limitations," he would suggest she consider surgical options. Dr. Barrett administered a cervical epidural steroid injection in interspace 6-7.

Dr. Barrett apparently directed Plaintiff to undergo a course of physical therapy with "The pt Group" in Murrysville, Pennsylvania. On July 27, 2007, Denise English wrote to Dr. Barrett, summarizing her initial findings. Ms. Smith had reported to the therapist that her worst pain was 8 or 9 on a 10 point scale and that she had decreased ability to perform activities of daily living. She also noted that during the seven years she had experienced back pain, it had gradually become worse. She described it as a "pulling throughout the spine," and indicated she had difficulty maintaining any movement or position. Hot water and a heating pad helped relieve the pain. Ms. English reported she had found a decreased range of motion throughout

24

both the lumbar and cervical areas of the spine, i.e., approximately 25% range of motion in her lumbar spine, 50% range of motion in her cervical spine on flexion and side bending, and 75% range of motion in rotation. Her tight hamstrings bilaterally limited her to 60% range of motion, and she experienced pain at the end range of all cervical and lumbar movement, even though she demonstrated significant guarding. Her strength in both upper and lower extremities was in the 4/5 range. (Tr. 207.) She further noted Ms. Smith had poor posture (i.e., forward head, rounded shoulders, and flattened lordosis.)[17]

Plaintiff's third visit with Dr. Barrett was on September 6, 2007. (Tr. 253-254.) He noted complaints of progressive neck pain with restrictions in range of motion together with fatigue and weakness in her legs when standing and walking. She described the neck pain as "a toothache like sensation" but had some relief with heat, Cymbalta for sleep, and Trazadone. In the meantime, she had completed nine of twelve prescribed physical therapy sessions[18]

---

[17] Judge Burock omitted any mention of this report. While we recognize that an ALJ is not required to discuss "every tidbit of evidence included in the record" (see Chun Soo Hur v. Barnhart, No. 03-3797, 2004 U.S. App. LEXIS 7364, *6 (3d Cir. Apr. 16, 2004)), this report is significant for two reasons: it is the sole report of objective physical therapy results in the record and it confirms other medical evidence of limited range of motion, ongoing pain, and difficulties performing activities of daily living.

[18] It is unclear how Dr. Barrett acquired this information. The only relevant reports from the physical therapy group are the letter of July 27, 2007, and two pages of session notes. (Tr. 205-211.)

during which "no significant treatment goals. . .were met." Dr. Barrett commented that Ms. Smith had "very limited improvement with range of motion from therapy and has reported that cervical epidural injection really afforded her no symptom improvement." (Tr. 253.) He indicated she had "been compliant and has followed through with all appropriate requests," but was still not making progress and was quite frustrated with the limited range of motion, sleep problems, and her function levels. Dr. Barrett proposed trigger point injections, more physical therapy with deep tissue massage, myofascial release techniques, and range of motion exercises. He recommended she consult with a neurosurgeon, Dr. Curt Conry (see details below.) He again mentioned her history of drug abuse and the fact that he was not recommending any type of analgesic or opioid management because of her history, but further commented, "She does not present with any drug seeking behavior nor inappropriate behavior on our exam nor during the course of our evaluations here at our facility." (Tr. 254.)

The final note from the Pain Clinic was written by Dr. Levi K. Zimmerman on October 10, 2007. (Tr. 251-252.) Dr. Zimmerman noted her history of myofascial pain, cervical spinal stenosis, depression, and complaints of pain radiating from her neck down her right arm. He noted that although Dr. Conry had suggested surgery, Ms. Smith had said she did not want to pursue any type of surgical

26

interventions or any other type of pain medications because due to her bipolar disorder, "she does not want to be taking too many medications." (Tr. 251.) He noted the past cervical epidural steroid injections had not provided significant relief, but trigger point injections had been effective to the point she was able to do some household chores; for example the injections on September 6 had given her "50% relief." Dr. Zimmerman prescribed continued physical therapy and a TENS unit[19] to help with the myofascial aspect of her pain, and provided trigger point injections for the myofascial spasms. Although the only pain medication she was taking at the time was 800 mg of ibuprofen three times a day, he recommended she decrease this dosage since it could be harmful to her liver and kidneys and exacerbate the occasional stomach aches she was already experiencing. Although she was directed to return in four weeks, there are no further notes from the Clinic in the record, presumably because, as Ms. Smith related to Dr. Velez, she had transportation problems and was discharged.

The ALJ summarized the Pain Clinic records accurately in his decision. (Tr. 17-18.) However, he implies in his treatment of the paragraph quoted above that Dr. Barrett had decided "not to prescribe

_____

[19] A transcutaneous electrical nerve stimulator or "TENS unit" is a device which electrically stimulates the skin to relieve pain by interfering with the neural transmission of signals from underlying pain receptors. *See* medical dictionary at MedlinePlus.

narcotic management given the claimant's history and her non-disclosure of her illicit substance use." (Tr. 17.) A more balanced reading of Dr. Barrett's notes raises the possibility of at least one other interpretation: Dr. Barrett may have believed there was no need for narcotic drugs (e.g., he stated there was "no indication for analgesic management") if the injections, continued physical therapy and possible surgery were effective. That is, the decision not to use opioids to manage Ms. Smith's pain could just have easily resulted from his reasoned decision not to expose her to such drugs unnecessarily.

The ALJ also stated,

> Furthermore, the claimant's credibility was questioned by Dr. Barrett in that he noted she had not disclosed her history of substance abuse despite two opportunities to do so. Although as discussed above, the claimant's substance abuse is not a severe impairment, this lack of disclosure reflects poorly on her credibility.

(Tr. 17-18.)

In most cases, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude. *See* Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). However, the Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir.

2005) (internal quotation omitted.) Here, the Court is unable to perceive how the ALJ arrived at this conclusion regarding Ms. Smith's credibility. Despite our detailed review of Dr. Barrett's notes, we find nothing which indicates Dr. Barrett questioned Plaintiff's credibility. In fact, Dr. Barrett noted numerous times Plaintiff's reports of extreme, constant pain and limited relief from conservative treatment, yet there is never any indication he doubted her reports either of the duration or intensity of her pain. Moreover, he noted at the September 6, 2007 appointment, again referring to her history of drug use, that she had been compliant in everything he had proposed to alleviate pain and that she did not present with "drug seeking behavior" or other inappropriate behavior. In short, Dr. Barrett's comment on the fact that she did not volunteer information about her drug use does not, necessarily, lead to the inevitable conclusion that he doubted her credibility.[20]

**c. Dr. Curt Conry:** As noted in the previous section, Dr. Conry, a neurologist with Western Pennsylvania Neurosurgical Associates, examined Ms. Smith at Dr. Barrett's request on September 21, 2007. In his report to Drs. Velez and Barrett, he commented that Ms. Smith's pain was primarily in the

---

[20] One might also ask a preliminary question: was Ms. Smith ever asked in either the September 2006 or the July 2007 medical appointment about prior drug use? The analysis and conclusion might well be different if she had overtly denied any such use. Yet Dr. Barrett commented only that she "did not disclose" her prior drug use.

29

posterior aspect of her neck and radiated into her right arm and down into her hand. The pain was described as "constant and quite debilitating," and resulted in weakness in her right arm. She occasionally had similar symptoms in her left arm, but that was generally pain free. She denied any pain or weakness in her legs. Although she had attempted extensive conservative management, e.g., therapy, nerve blocks and multiple medications, the pain continued to worsen. Dr. Conry also noted that her cranial nerves were intact bilaterally; strength was 5/5 in left upper and bilateral lower extremities, but less (4 to 4+) in her right arm. She had some decreased sensation to light touch in the right biceps region. There was reproducible pain on axial loading of her cervical spine into her right arm. She had a good range of motion in her cervical spine and no pain on deep palpation of the area. She could ambulate well and walk on her heels and toes without difficulty. A "good quality" cervical MRI scan showed "a sizable disk/osteophyte complex at C4-5 and C5-6 causing severe spinal and foraminal stenosis." (Tr. 231.) Dr. Conry concluded, "Given the presence of weakness as well as the long-standing pain she has had, I believe her best option is cervical decompression and fusion via a C4-5 and C5-6 anterior cervical diskectomy and fusion. . . .I also said she could continue conservative treatment with injections, pain medications, muscle relaxants, etc. I would not recommend this, however, in the face

of ongoing weakness." (Tr. 231-232.)

The ALJ acknowledged that although Dr. Conry had recommended surgery, he consider the physician's "objective findings on examination [to be] minimal." (Tr. 18.) However, he fails to explain why he considered the findings of a specialist in neurology (albeit not a long-term treating physician) to be "minimal" when they were based on a hands-on examination and review of a "good quality" MRI of her cervical spine; nor does he identify the medical evidence which supported his conclusion. *See* Brownawell c. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008) ("contradictory medical evidence is required for an ALJ to reject a treating physician's opinion outright.")

                **d.**     **Consultative physical examination:** On September 4, 2007, Ms. Smith underwent a consultative physical examination by Dr. Nostratollah Danai at the request of the Pennsylvania Bureau of Disability Determination. (Tr. 212-221.) Dr. Danai noted that the information he compiled was based on Ms. Smith's report, "who appears reliable." As she had in her other treatment interviews, Ms. Smith reported that her main concern was pain in her upper and lower back which had lasted almost eight years, and that despite treatment with her family physician and at the pain clinic, she had not experienced any improvement. On physical examination, Dr. Danai noted that her cranial nerves were intact;

tendon reflexes were 1+ and symmetrically normal. She evidenced no tremors, the Babinski and Romberg tests were negative, and there was no gross sensory nerve impairment. (Tr. 214).

Dr. Danai completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" in which he concluded Ms. Smith was limited to lifting and carrying two to three pounds frequently and ten pounds occasionally; she could stand one to two hours in 8-hour day and sit for less than six hours. She was unable to use her lower extremities for pushing and pulling; could occasionally bend, kneel, stoop, and crouch; and had no restrictions in her ability to balance, but could not climb. There were no limitations in other physical functions except that she required glasses and should not be exposed to moving machinery.

In evaluating Dr. Danai's report, the ALJ commented that although Ms. Smith had complained to him of frequent migraine type headaches, she had no dizziness, earache, sore throat or stiffness of neck on examination. (Tr. 18.) The Court is at a loss to understand why this information is important since these are not typical symptoms of migraine headaches; even if they were, there is no evidence she was experiencing a migraine at the time of the examination. He further commented that Dr. Danai noted she had no chest pain, cough, shortness of breath, tremors, gross sensory nerve impairment, no edema, clubbing fingers or peripheral cyanosis on

32

examination of the extremities. (Tr. 18.) Again, these symptoms appear to be irrelevant to any severe impairments Plaintiff alleges. In evaluating Dr. Danai's medical source statement (which he accurately summarized), the ALJ commented that he was rejecting "these limitations as they are extreme and not supported by the objective findings of record. The evidence is consistent with finding the claimant can perform at least light exertion." (Tr. 20.)

3. *Conclusions regarding the ALJ's evaluation of the medical evidence:* Looking comprehensively at the ALJ's analysis of the evidence regarding Plaintiff's physical impairments, we are compelled to conclude that he first failed to assign any weight to the opinions of Plaintiff's treating physicians, Drs. Velez and Barrett, regarding the duration, intensity, and effects of Ms. Smith's back and neck pain, myofascial pain associated with fibromyalgia, or headaches. Second, he apparently gave little weight to Dr. Conry's recommendation that Plaintiff undergo a cervical diskectomy and fusion, which would tend to support the conclusion that her cervical condition was quite grave, because he found Dr. Conry's "objective findings on examination were minimal." (Tr. 18.) Third, he rejected the limitations set out by Dr. Danai as "extreme and not supported by the objective findings of record." (Tr. 20.) Finally, he rejected Ms. Smith's own testimony as not credible, based at least in part on his belief that Dr. Barrett had

found her not credible, a conclusion which does not appear to be supported in Dr. Barrett's notes.

The ALJ thus concluded that the evidence was consistent with finding that Ms. Smith could perform, at a minimum, work at the light exertion level, meaning she could lift up to 20 pounds occasionally, lift and carry objects weighing up to 10 pounds occasionally, stand or walk six hours and sit two hours in a typical 8-hour workday.[21] The problem with this ultimate conclusion and the earlier ones regarding the physicians' treatment records and Ms. Smith's testimony is that the ALJ fails to point to any medical evidence in the record which supports them, other than vague allusions to the "objective findings in treatment records." Despite the Court's best efforts, we have been unable to independently identify any such findings. Instead, we find that this is a case in which the claimant's testimony regarding her subjective symptoms, particularly pain, is reasonably supported by the medical evidence. In such cases, "the ALJ may not discount claimant's pain without contrary medical evidence." Ferguson v. Schweiker, 765 F.2d 31, 37

---

[21] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

(3d Cir. 1985).

We are left with the inevitable conclusion that the ALJ could only have relied on his own opinions as to the severity of Ms. Smith's pain and its effect on her ability "to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week or an equivalent work schedule.)" Social Security Ruling 96-9p.

While an ALJ is "certainly entitled to use his own experience in the weighing of evidence to sort through the various medical opinions presented en route to a reasoned conclusion," he may not substitute his own lay judgment for examining doctors' expertise. Facyson v. Barnhart, No. 03-3172, 2004 U.S. App. LEXIS 7362, *9 (3d Cir. Apr. 15, 2004), citing 20 C.F.R. § 404.1527(b) to (d) and Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999.) Although it is not clear if the ALJ rejected outright the medical opinions of Plaintiff's treating physicians, such a rejection would require contradictory medical evidence which, as we have noted, has not been identified by the ALJ. See Brownawell, supra. In the absence of any explanation by the ALJ as to the medical evidence on which he based his ultimate conclusion that Ms. Smith had the physical capacity to perform a full range of light work,[22] this Court is unable to complete

---

[22]  The ALJ did limit the range of light work to routine repetitive tasks involving only one or two steps and little independent decision making. (Tr. 16.)  Although not discussed in this Memorandum, we find much of the

the meaningful review required in this Circuit. *See* Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) (although the ALJ need not use "particular language or adhere to a particular format in conducting his analysis," he must provide "sufficient development of the record and explanation of findings to permit meaningful review.")

## V. **FURTHER PROCEEDINGS**

"A district court, after reviewing the decision of the Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

---

ALJ's analysis of Plaintiff's mental impairments to share the same flaws as those in the analysis of her physical impairments, mainly the apparent rejection of Dr. Velez's comments on the severity of her bipolar disorder and rejection of the consultative psychological examiner's opinion that Ms. Smith had numerous mental limitations with regard to work-like behaviors (*see* Tr. 227) as "inconsistent with the evidence as a whole." (Tr. 20.) Where, as here, the ALJ has found that the claimant has moderate difficulties with concentration, persistence or pace (*see* Tr. 15), the limitation to work which requires "simple one to two step tasks," without greater specificity, is generally insufficient to convey the impairment in this area. *See* Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004); *also* Social Security Ruling 96-8p.

Based on the evidence, we are not convinced that Ms. Smith is disabled and entitled to benefits, primarily because we are unable to discern how the ALJ considered and weighed much of the medical evidence. There also seem to be numerous instances of medical evidence from July 2004 onward which may be missing from the record. Rather than award benefits outright, therefore, we remand to the Commissioner for clarification of the ALJ's reasoning and further consideration.

May  10 , 2011

William L. Standish
United States District Judge